Wachtler, J.
A defendant’s right to be present at a criminal trial is embodied in the confrontation clauses of the State and Federal Constitutions (NY Const, art I, § 6; US Const, 6th Amdt), and the CPL (260.20, 340.50; see, also, Fed Rules Crim Pro, rule 43). This appeal raises the difficult problem of when, if ever, a defendant in a criminal trial who is in custody may waive his right to be present at trial.
The appellant, Donald Epps, was indicted in 1972 and charged with four counts of attempted murder, two counts of sexual abuse in the first degree, two counts of sexual misconduct, sodomy in the first degree, two counts of coercion in the first degree, grand larceny in the third degree and six counts of assault in the first degree. The underlying criminal acts were perpetrated in March of that year upon two female victims. Epps was arrested and in lieu of bail was sent to the Brooklyn Men’s House of Detention to await trial. On Thursday, July 20, 1973 the appellant was present in court as the People and defense counsel commenced jury selection. Epps was present the next day when this process was completed and the jury was sworn. The court then gave its preliminary charge and the People presented their opening statement. After lunch the People’s first witness Lamuriel Yvonne Kindred took the stand.
Miss Kindred testified that on the night of the crimes she and one Asa Williams accompanied Epps to various places in search of some cocaine. They eventually arrived at an apartment in Brooklyn where they disrobed and drank rum and grape soda. The terrifying events of that night began sometime later when the defendant kicked Miss Williams and then began beating her with a belt. He also struck Miss Kindred and threatened both girls by stating that his Doberman Pinscher would attack them if they moved. Epps then dragged Miss Williams into the bathroom and placed her in a tub of scalding hot water. When she screamed he held her head under the water. The witness further related how the defendant sodomized and beat her after which he ordered her to perform a series of grotesque acts.
Later, when the defendant lay down, the witness escaped to *346 her father’s house. She spent three days in Cumberland Hospital following this ordeal.
After Miss Kindred had completed this portion of her direct testimony appellant’s counsel requested an adjournment until the following Monday morning. The court granted this request, adjourning to 11 o’clock Monday morning, July 24.
Although the record is unclear, it appears that the defendant refused to come to court that Monday morning. However, the trial recommenced that afternoon at about 2:55 p.m. when the defendant decided, on the advice of counsel, to attend the trial. Before the jury returned the Trial Judge noted the presence of the defendant and commended him for following counsel’s advice. This was to be the defendant’s last appearance in court.
After the People completed Miss Kindred’s direct testimony, defense counsel cross-examined her. Although' her involvement with narcotics and prostitution was exposed in great detail, cross-examination did not elicit any inconsistencies concerning the events at the apartment. Prior to the completion of this cross-examination the trial was recessed until 10 o’clock Tuesday morning.
When the court convened the following day, the Judge was informed by the bailiff that Epps had refused to leave his cell. The Judge called Captain Hugo Fasano, an officer with the Department of Correction, who testified that a number of the inmates of the Brooklyn House of Detention were boycotting the courts and that the defendant was among them. The court directed Fasano to have a warden at the detention center speak with Epps and find out if he intended to appear and to warn him that as the court “warned him yesterday, at the end of yesterday’s session, that if he doesn’t appear I [the court] intend to proceed in his absence with the trial.” The court further instructed Fasano to inform the defendant that it would adjourn until such time as Epps would arrive, but that if he did not intend to appear the trial would proceed without him. The court continued, “He already was warned yesterday by his lawyer who went to the cell to tell him about it, and then after the case was over, I warned him to be here and I asked him if he’d be here, and he said he would be here.”
The officer complied with the court’s instructions and reported that Epps “still refused” to appear despite the fact that he was physically able to do so. After a motion for a mistrial *347 was denied, the trial proceeded with the court duly admonishing the jury not to speculate on or draw inferences from the absence of the defendant. The testimony of Asa Williams and the arresting officers was given during Tuesday’s session with both witnesses being cross-examined by defendant’s counsel.
On the following morning, July 26, Captain Fasano reported that Epps once again refused to attend court although he had been warned that he would be tried in absentia. The captain presented the court with statistics concerning the inmate boycott. On Monday, 56 inmates had court appearances and 25 showed up. On Tuesday there were 55 scheduled for court of whom 24 came in. On Wednesday 46 were supposed to appear and 31 did. The court then directed Fasano to call the officer in charge of appellant’s custody and advised him to tell Epps that he could come to court as late as 2:00 p.m. The trial continued without the defendant and at 2:15 p.m. Captain Fasano reported that Epps refused to come because "He is not interested.” The court again advised the jury not to speculate as to the defendant’s absence and the trial continued.
At the conclusion of the People’s case, defense counsel stated that because of his client’s absence he would rest. The Trial Judge then directed counsel to proceed to the House of Detention and advise his client of the status of the case and inquire whether or not he desired to testify. Counsel stated that he would advise Epps not to testify and accordingly he rested.
On July 27, the day of the charge, Captain Fasano again took the stand and reported that of 65 defendants scheduled for court 40 appeared. At this point, the court asked defense counsel whether he had communicated with the defendant’s wife since the court had given her permission to see the defendant. The defense attorney answered that he had had no further contact with Mrs. Epps, or for that matter with the defendant who concededly had access to a phone.
During this colloquy counsel intimated that Epps’ refusal to come to court may have been prompted by fear of reprisals. However, upon further examination by the court, counsel conceded that he had only assumed that the defendant feared reprisals. Moreover, the attorney testified that during a conversation with defendant in the detention center, Epps called over a prisoner who appeared to be the leader of whatever insurrection was taking place at the center and that this leader advised Epps to appear in court. The Trial Judge, *348 satisfied that the defendant’s absence was voluntary, proceeded to charge the jury.
The jury found the defendant guilty of two counts of assault, third degree; one count of sodomy, first degree; and one count of assault, first degree. Before sentencing, defendant moved to vacate his conviction on the ground that he was tried in absentia. This motion was denied by the trial court and on appeal was affirmed by the Appellate Division.
The appellant’s first contention is that the right to be present at trial is not susceptible of waiver. Although this was true at common law it is no longer a valid statement of law.
Historically the right of an accused to be present at trial is traceable to the rudiments of our jurisprudence (see, generally, 2 Pollock & Maitland, Hist Eng Law [2d ed], ch VIII; Goldin, Presence of the Defendant at Rendition of Verdict in Felony Cases, 16 Col L Rev 18). One compelling reason for this principle was an innate aversion to default judgments in criminal matters. This aversion was manifest in the consequences imposed when an accused failed to appear. Rather than declaring such a person guilty, our predecessors branded him an "outlaw” who, being outside the pale of the law could be dealt with summarily by anyone who came upon him. Another reason stems from the perception that criminal matters were not offenses against the community but solely offenses against the individual. Consequently in order to obtain redress it was incumbent on the injured party to bring the offender before the tribunal. Once an accused was before the court there was a more pragmatic reason for mandating his presence; guilt or innocence was determined either through trial by ordeal or battle.
As civilization developed and the right to trial by jury was recognized at common law, the right to be present at trial retained its vitality in order to prevent the evil of secret trials and to guarantee the defendant’s presence at all important parts of his trial (see People v Thorn, 156 NY 286). This latter reason was significant in view of the fact that representation by counsel is a comparatively recent development (3 Blackstone’s Commentaries, p 25; Powell v Alabama, 287 US 45, 60). In light of these and other considerations, it is not surprising that the common-law courts deemed presence a requisite to jurisdiction. As such, it was considered absolute and nonwaivable (see, e.g., Hopt v Utah, 110 US 574; Lewis v *349 United States, 146 US 370; Ball v United States, 140 US 118; Maurer v People, 43 NY 1).
Despite the broad dicta in these early cases, the right to be present is clearly waivable under both the Federal and State Constitutions. In Diaz v United States (223 US 442, 455) the court held that the right to be present exists for the benefit of the accused and where he voluntarily absents himself it operates as a waiver. Subsequently, the principle that a defendant may waive his right to be present by consent or misconduct was reiterated in Snyder v Massachusetts (291 US 97, 106) and Illinois v Allen (397 US 337, 342-343). (See, also, Drope v Missouri, 420 US 162; Taylor v United States, 414 US 17; Tacon v Arizona, 410 US 351.)
Under the New York constitutional and statutory guarantees of the right to be present, the early cases reflected the common-law position that the right is absolute and may not be waived (Stephens v People, 19 NY 549; Maurer v People, 43 NY 1, supra; People v Perkins, 1 Wend 41). The appellant relies heavily on Maurer which construed the statute implementing the constitutional safeguard and concluded that (p 5) "the court has no jurisdiction to try an indictment for felony unless the accused be present”. This unequivocal position was gradually diluted in subsequent cases. Thus, in People v Bragle (88 NY 585, 589-590), the court upheld a conviction despite the defendant’s absence, finding that "his absence was a voluntary one at his own request, for his own benefit, and we may assume essential for the protection of his rights”. Moreover, the court noted that the statutory protection was for the protection of the accused and substantial performance was all that was required. The transition to the modern view was completed in People v La Barbera (274 NY 339), where our court held that in the case of felonies not punishable by death, the defendant may waive his right to be present. There, it was noted that in view of the development of the right to counsel and the abandonment of trials by ordeal or battle, there appeared no reason for considering this right nonwaivable (p 344).
Since that time we have consistently recognized the waivability of the right to be present (see, e.g., People v Byrnes, 33 NY2d 343; People ex rel Lupo v Fay, 13 NY2d 253, cert den 376 US 958; People ex rel. McBride v Fay, 19 AD2d 712, affd 14 NY2d 843). Nor do we consider the contrary dicta in People *350 v Anderson (16 NY2d 282, 287) and People ex rel. Bartlam v Murphy (9 NY2d 550, 554) as compelling an opposite view.
The key issue is whether this defendant knowingly, voluntarily and intelligently relinquished this known right (Johnson v Zerbst, 304 US 458, 464). The appellant’s most vigorous attack centers on the lack of voluntariness. He urges us to adopt a per se rule which would automatically preclude waiver where the accused is in custody. The basic reason being that in such a case the presence or absence of the accused is not within his control in contrast to the case of a defendant who is free on bail and flees the jurisdiction. In the latter instance the appellant agrees that a waiver may be inferred from the fact that the defendant is a fugitive from justice (see People v Colombani, 22 AD2d 956, affd 16 NY2d 1055). However, he argues that once a defendant is refused bail the State controls his freedom and is obligated to produce him at trial.
While such an immutable rule is superficially appealing we think it goes too far. We prefer a more realistic approach; one which may be more readily applied in exceptional circumstances. Whenever there is a waiver by an incarcerated defendant it will be suspect and subjected to careful examination. If a judicial inquiry discloses the slightest hint of official connivance or obstruction with respect to the defendant’s right to be present at his trial, that waiver will not be operative.
The instant case presents a much different situation. Here there was no official conspiracy to deprive this inmate of his right to be present and confront witnesses. Rather the defendant, along with other inmates, were consciously and actively boycotting the courts. To permit such conduct to halt countless trials would set an extremely dangerous precedent and encourage future insurrections. In addition the right to a speedy trial would be jeopardized. The issue of voluntariness is a question of fact which should not be resolved by per se formulations. Here the trial court determined that the defendant had the opportunity to be present but failed to avail himself of the opportunity by his own volition. We see no reason to disturb that finding as a matter of law.
The appellant next takes aim at the "knowing and intelligent” aspect of the waiver. Conceding arguendo that a defendant in custody is capable of waiving, he claims that it is incumbent on the court to have the accused brought before *351 the court and at the very least state his waiver on the record. Again, we find such a rule overly rigid. We agree that such a procedure is preferable. However, we cannot ignore the context in which the instant waiver was effected. The record establishes that the appellant was counseled by the Trial Judge and his attorney that it would be in his best interest to attend his trial and the defendant promised to return. In addition, Epps was repeatedly advised by Department of Correction personnel pursuant to the direction of the court as to the nature of the proceedings against him and the consequences of his refusal to leave his cell. Surely this defendant knew and appreciated the impact of his joining the boycott.
To require, as the appellant urges, the court to send officers into the defendant’s cell to bind and shackle him and deliver him by force merely to pronounce a pro forma waiver would not only have constituted an empty gesture but on these facts may well have precipitated a more serious disturbance. Moreover the responsibility in such a situation does not rest solely with the court. During this boycott a large percentage of those inmates scheduled to appear in court did in fact appear. It would seem absurd to allow _this defendant to abort the trial merely by refusing to leave his cell. To condone this course of conduct, particularly where the defendant senses imminent conviction, would make a travesty of our criminal justice system.
We would affirm in view of the clear evidence of waiver and the exceptional circumstances of. this case.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
Order affirmed.